# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 5, 2013

## IN THE MATTER OF: SKYLAR B. D.
## IN THE MATTER OF: WAYLON R. D.

**Appeal from the Juvenile Court for Sumner County**
**No. 2011JV13**
**No. 2010-JV-532,   Barry R. Brown, Judge**

---

**No. M2013-00256-COA-R3-PT - Filed July 30, 2013 -Filed July 30, 2013**
**No. M2013-00331-COA-R3-PT - Filed July 30, 2013 -Filed July 30, 2013**

---

The Department of Children's Services filed two petitions to terminate the parental rights of a mother to each of her two children after they were found to be dependent and neglected. The mother was served with both petitions, but she failed to appear at the proceedings where the court heard evidence about her persistent drug use and the Department's attempts to help her overcome the problems that prevented her from safely parenting her children. The trial court found that the Department had established two grounds for termination by clear and convincing evidence that applied to both petitions: persistence of conditions and substantial failure to comply with parenting plans. The court also found that it was in the best interest of the children that the mother's parental rights be terminated. Mother appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ. joined.

Bruce N. Oldham, Gallatin, Tennessee, for the appellant, Evelyn L.

Robert E. Cooper, Jr., Attorney General and Reporter, Marcie E. Greene, Assistant Attorney General, Office of the Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. DEPENDENCY AND NEGLECT PROCEEDINGS

The older of the two children in these cases is Skylar B. D. He was born out of wedlock to Evelyn L. (Mother) and Seth W. on March 29, 2001.[1] In July of 2010, the Department of Children's Services (DCS) received a referral alleging that Mother was abusing drugs and that she and her then-paramour were subjecting Skylar to medical maltreatment and lack of supervision. Seth W. filed a private petition for custody of the child, and the Juvenile Court judge ordered a home study and immediate drug screens to be conducted on both parents. Father tested negative for all substances, but Mother, who was four months pregnant at the time, tested positive for marijuana and cocaine.

On July 29, 2010, DCS filed a Petition in the Sumner County Juvenile Court to adjudicate Skylar dependent and neglected and for his emergency removal from Mother's custody. The petition asked the court to appoint a guardian ad litem for the child, and recited that Father's parents had agreed to act as foster parents and to take all necessary classes for that purpose. The trial court entered a protective custody order on July 30, 2010, which placed Skylar's care and custody with DCS. Skylar was adjudicated as dependent and neglected on September 8, 2010, after a hearing. Mother was subsequently ordered to pay child support in the amount of $35 per week.

DCS drafted a detailed Family Permanency Plan for Skylar, with listed goals of "return to custody" and "exit custody with relative."[2] Among the concerns recited in the plan was that Mother "has tested positive for drugs in the past," and among the desired outcomes was "Skylar will be in an environment free from alcohol, illegal drugs and prescription drug abuse." Accordingly, the plan required Mother and Seth W. to abstain from the use or abuse of such substances and to submit to random drug screens. The plan also allowed Mother and Seth W. to have supervised visits and letters and phone calls with the child, and it required them to show that they could meet Skylar's basic needs by maintaining housing and obtaining sufficient income by legal means.

---

[1]No father was named on the birth certificate, but Seth W. was listed as Skylar's father on the putative father registry.

[2]The record shows that DCS created a number of Permanency Plans for Skylar during the course of these proceedings. Mother's responsibilities remained substantially the same in all of those plans, but the final plan added adoption as one of its goals.

On December 17, 2010, while the proceedings involving Skylar continued, Mother gave birth to Waylon R. D. No father was named on the birth certificate. Mother asserted, however, that she was married to James L. at the time of Waylon's birth, making him Waylon's legal father.[3] *See* Tennessee Code Annotated section 36-2-304(a)(1); *In re T.K.Y.*, 205 S.W.3d 343, 348 (Tenn. 2006). Another individual, Mother's then-paramour, signed a voluntary acknowledgment of paternity, which he subsequently revoked. As we noted above, Mother tested positive for cocaine and THC during her pregnancy. She was also tested for drugs at the time of Waylon's birth and again tested positive for cocaine and THC.

Because of Waylon's exposure to drugs, DCS petitioned the Juvenile Court to adjudicate him dependent and neglected and to remove him from Mother's custody. The Juvenile Court placed Waylon in the temporary protective custody of DCS on January 13, 2011. The child was adjudicated dependent and neglected on March 17, 2011. Like his brother, Waylon was placed in foster care, and Mother was ordered to pay child support of $25 per week. There is no proof in the record that Mother paid any of the ordered child support for Skylar or for Waylon.

The Family Permanency Plan that DCS drafted for Waylon included adoption as a goal in addition to return to custody and exit custody with relative. It also recited the same concerns about substance abuse and the same requirement that Mother maintain housing and obtain income by legal means as had been included in the plans for Skylar. The trial court conducted hearings on the Permanency Plans for Skylar and Waylon and ratified both plans.

## II. TERMINATION PROCEEDINGS

On March 29, 2012, DCS filed two petitions for the termination of Mother's parental rights. One petition, given the docket number 2010-JV-532, asked the trial court to terminate the rights of Mother and Seth W. to Skylar R. D. The other, docketed as 2011-JV-13, asked the trial court to terminate the rights of Mother and "Unknown Father" to Waylon R. D. An amended petition in case 2011-JV-13 added James L. as a defendant. Each petition recited the events that brought the children into the Department's custody. The grounds alleged for termination included abandonment by failing to visit or support the children, failure to comply with the provisions of the parenting plans, and persistence of the conditions that prevent the child's return to the care of its parents. On September 14, 2012, prior to the final

---

[3]The marital status of Mother and James L. was unverified. Social Worker Gale Smith testified that she could find no record of a marriage between the two in the State of Tennessee. She further testified that Mother presented her with a document in 2012 in which Mother requested a divorce from James L. and stated that the two were married on May 4, 2007.

termination hearing, Seth W. voluntarily surrendered his parental rights to Skylar.

The hearing on both termination petitions was conducted on November 16, 2012. Mother was not present for the hearing, nor was James L. Mother was represented by appointed counsel. The Guardian ad Litem also participated. The DCS attorney announced at the outset that he intended to put on the proof for the Skylar's petition first, and then put on the proof for Waylon.

Mother's attorney stated that his client had been served with the petition and that he understood she was in New Mexico, but that he had been unable to contact her for at least six weeks. The only witness to testify was Gale Smith, a family service worker for DCS who had been assigned as Skylar's caseworker in June of 2011, and who had participated in the creation of parenting plans for both children.

Ms. Smith testified that Mother underwent fifteen drug screens during the time that Skylar was in DCS custody, and that she tested positive for drugs on eight of those, including positive screens for benzodiazepines, cocaine, THC and opiates. She also testified that Mother sometimes remained out of touch for weeks at a time making it impossible to perform drug screens during those periods. The results of the various screens were entered into the record as exhibits. Ms. Smith acknowledged under cross-examination that because of Mother's prescription medication, one screen for opiates could have resulted in a false positive.

Ms. Smith was asked what efforts DCS had made to assist Mother with her drug and mental health issues. She testified that the department provided Mother with individual in-home counseling as well as enrolling her in several outpatient treatment programs. When transitional housing was recommended, the Department tried to get Mother into Magdelene House, the Nashville Rescue Mission, and Home Safe. But Mother was not cooperative, and all those placements fell through.

Ms. Smith also arranged visitation between Mother and the children, which usually took place at a fast food restaurant. She testified that there were three visits in the four months prior to the filing of the termination petitions. She characterized those visits as minimal by DCS standards, because while Mother held Waylon, she did not otherwise interact with the children by talking to them or by asking Skylar how school was going or things of that nature.

Ms. Smith further testified that Mother briefly lived in an appropriate home, but that she was homeless at times, and that the Department tried to help her with housing and

employment, as well as providing her with bus tickets, food, and clothing. At one point, Mother was living in a one-bedroom apartment with her paramour, who had an extensive record of domestic violence. Ms. Smith testified that Mother told her that her paramour beat her up many times. The Department also tried to work with Seth W., and twice tried to place Skylar with him. The first time, he stated that he was unable to take care of the child. The second time, he was incarcerated in the State of Illinois.

Mother moved out of state in February 2012. She told Ms. Smith that she was in Oklahoma, but gave her an address in Texas. Ms. Smith sent some documents to the Texas address, but they were returned undelivered. Mother eventually informed Ms. Smith that she moved to New Mexico, and she reported several different addresses in that state. Ms. Smith testified that Mother told her that she was pregnant again, and that she left Tennessee to prevent DCS from taking the baby she was carrying.

Ms. Smith also recounted a number of phone conversations she had with Mother during the months leading up to the termination hearing. Over a period of less than three months, Mother reported participating in a variety of different programs in New Mexico to address her problems, including a rehabilitation facility, a methadone clinic, and a detox hospital. Because Mother did not give Ms. Smith specific information about most of those programs, she was unable to confirm either Mother's participation in them, or any progress resulting from that participation. During the last conversation between Mother and Ms. Smith, about one month prior to the termination hearing, Mother said she had been evicted from her apartment and was staying at a domestic violence shelter.

In response to direct questioning about Skylar's best interest, Ms. Smith testified that the child had been in DCS custody for most of his life. He was currently in a pre-adoptive home with Waylon and was doing very well in that environment. He was bonding with his foster family and with his brother, was in Boy Scouts and on the honor roll at school. Conversely, in Ms. Smith's opinion, Mother was unable to provide an environment in which a child could thrive and grow, because she had not remedied her problems of drug abuse or her life circumstances in regard to housing and income. On cross-examination, Ms. Smith acknowledged that her understanding of Mother's current circumstances in New Mexico was limited.

At the conclusion of Ms. Smith's testimony, the trial court asked whether there would have been any difference in her testimony in regard to Waylon than it was for Skylar. Ms. Smith was called back to the stand, and she affirmed that her testimony about Mother's conduct and about the efforts put forth by the Department to help her would have been same for both children.

Then court then ruled from the bench. Its decision was memorialized in two orders, both filed on December 7, 2012. The court declared in both orders that DCS had failed to carry its burden of proof that Mother had abandoned her children by willfully failing to visit or willfully failing to pay child support. The court found, however, that two separate statutory grounds for termination had been proved by clear and convincing evidence.

The court declared that Mother was in substantial noncompliance with the parenting plans because she had failed to provide a safe and suitable home for the children, *see* Tenn. Code Ann. § 36-1-113(g)(2), and that the conditions that caused the children to be removed from the Mother's home still persisted, preventing their safe return to her care, *see* Tenn. Code Ann. § 36-1-113(g)(3). The court also found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children, and it accordingly terminated her rights to both children. Mother appealed both orders. The court's order in case 2011-JV-13 also terminated the parental rights of James L. and "Unknown Father" of Waylon. James L. did not file an appeal.[4]

### III. THE STANDARD OF REVIEW

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

---

[4]The record shows that the appointed counsel who represented Mother at the trial court level filed a motion to withdraw prior to appeal because their attorney-client relationship had broken down so badly that he was no longer able to effectively represent her. He cited, among other things, her refusal to follow his advice or to maintain contact with him, including her failure to appear at the termination hearing or to contact him prior to the hearing, and her cursing him and hanging up on him when he told her that the appeal was unlikely to succeed. The trial court granted the attorney's motion and appointed new counsel for this appeal.

Tennessee Code Annotated § 36–1–113(c) requires that termination of parental rights be based upon: (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental rights have been established; and (2) that termination of the parent's rights is in the best interests of the child. Both grounds and best interests must be proved by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250 ; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769, and its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622.

Appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Thus, reviewing courts will review the trial court's findings of fact *de novo* on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

In light of the heightened burden of proof in termination proceedings, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements necessary to terminate a parent's rights. *In re Bernard T.*, 319 S.W.3d at 597. A reviewing court must review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground. . . ," a conclusion of law, *de novo* with no presumption of correctness. *In the Matter of M.L.P.*, 281 S.W.3d at 393 (quoting *In re A.M.H.*, 215 S.W.3d at 810).

## IV. THE GROUND OF SUBSTANTIAL NON-COMPLIANCE

The trial court found that two statutory grounds for termination existed in this case, substantial noncompliance with the permanency plan and persistence of conditions. The proof required to establish those grounds frequently overlaps, as it does here, because the permanency plan is often designed to address the very conditions whose persistence makes it inadvisable to restore custody of the child to the parent. Both of those grounds also invoke DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the parent's custody. *See* Tenn. Code Ann. § 37–1–166; *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008); *In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007).

The record of this case includes an Affidavit of Reasonable Efforts, detailing the

assistance rendered by DCS caseworkers to help Mother overcome her negative habits and living conditions. The testimony of Gale Smith expanded and updated the account of those efforts. They included enrolling Mother in programs to treat her substance abuse problems, attending sessions of supervised visitation with Mother and the children, trying to help Mother with housing and employment, and providing her with bus tickets, food, and clothing. It appears that those efforts failed in large part because Mother did not herself make the effort necessary for them to succeed. In sum, we find that DCS satisfied the requirement of reasonable efforts in this case. We now turn to the specific grounds for termination found by the trial court.

The relevant statutory language defining the first ground is that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2).

In order to establish this ground, the proof must show that the responsibilities set out in the permanency plan are reasonable and are related to the conditions which required that the child be removed from the parent's custody. Tenn. Code Ann. § 37-2-403(a)(2)(C). Further, the parent's noncompliance must be substantial in light of the importance of the particular requirement that has not been met. *In re M.J.B.,* 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.,* 140 S.W.3d at 656-57 (Tenn. Ct. App. 2004) (citing *In re Valentine,* 79 S.W.3d 539, 548 (Tenn. 2002)).

In the present case, Mother's primary responsibilities under all permanency plans for both children were to overcome her habitual abuse of alcohol, illegal drugs and prescription drugs and to meet the basic needs of the children by maintaining housing and obtaining sufficient income by legal means. Those responsibilities are eminently reasonable, for they are among the basic conditions necessary to establish and maintain a safe, secure and healthy environment for bringing up children.

The proof showed that Mother tested positive for banned substances eight times after Skylar came into DCS custody. She also made herself unavailable for testing for weeks at a time, thereby avoiding the possible discovery of additional drug abuse. DCS arranged for individual counseling and a variety of outpatient treatment programs to help Mother overcome her substance abuse problems, but they were unavailing. Mother resisted the Department's efforts to place her in transitional housing.

Further, there was no evidence that Mother ever achieved the goals of stable housing or stable employment. She lived in an apartment in Tennessee at one point, but had to share

it with her abuser. At other times, she was homeless and needed the assistance of DCS to meet her basic needs. After Mother left the State, she gave Gale Smith contradictory information about where and how she was living. During Mother's last conversation with Ms. Smith, she said she had been evicted from her apartment and was staying at a domestic violence shelter.

Mother's attorney's attempts to use the lack of reliable information about her exact circumstances to her advantage on appeal. He complains that DCS failed to ask New Mexico to do a home evaluation on Mother through the Interstate Compact on the Placement of Children (ICPC), implying that in the absence of an up-to-date home study, it was impossible for the trial court to find by clear and convincing evidence that Mother was substantially out of compliance with the permanency plan. He further argues that Mother's enrollment in several different substance abuse programs in New Mexico indicates that "she was actively seeking help to enable her to live a sober lifestyle" "and, thus, making a serious effort to overcome her problems and comply with the plan."

We note that Gale Smith testified that Mother did not furnish her with sufficient information and documentation to submit an effective ICPC request. Nor did Mother supply sufficient information for DCS to confirm her participation in those programs. Further, insofar as there are gaps in the evidence, these directly resulted from Mother's failure to maintain adequate communication with her attorney and with her caseworker, and her refusal to even show up at the final hearing on the termination of her parental rights.

This court has previously held that a parent's refusal to cooperate or participate in a termination proceeding does not relieve the State from affirmatively proving at least one ground for termination by clear and convincing evidence. *In re Deon S.*, W2012-01950-COA-R3-PT, 2013 WL 1636436 (Tenn. Ct. App. Apr. 17, 2013) (no Tenn. R. App. P. 11 application filed). There was ample evidence in this case, however, presented primarily through the testimony of Gale Smith, that Mother frequently abused drugs and that she failed to maintain stable housing and employment after her children came into DCS custody.

If Mother had appeared at the final hearing, she would have had the opportunity to controvert Ms. Smith's testimony or to present evidence of any progress she had made to meet the requirements of the permanency plan. She did not do so, and in the face of her silence on the matter, we are unwilling to assume that any such evidence exists. In short, we affirm the trial court's finding that Mother was in substantial non-compliance with the permanency plan.

## V. THE GROUND OF PERSISTENCE OF CONDITIONS

Only one ground for termination need be proved to form the basis for a termination of parental rights. Thus, we will discuss the trial court's finding of a second ground for termination more for the purpose of completeness than as a matter of legal necessity. That ground is often referred to as "Persistence of Conditions." Tenn. Code Ann. § 36-1-113(g)(3) describes it as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

There is no dispute that Skylar and Waylon had both been removed from Mother's home for at least six months. With regard to the first factor, one of the primary conditions that led to the removal of the children was Mother's abuse of drugs, and the proof showed that she continued to test positive for such substances as benzodiazepines, cocaine, THC and opiates after the children were removed from the home. With regard to the second factor, despite Mother's enrollment in numerous programs to treat her substance abuse problems, there was absolutely no evidence to show that her drug use had abated in any way, or that it was likely to abate any time in the near future.

Finally, Gale Smith testified that Skylar and Waylon were doing well living together in a pre-adoptive home. Although the foster parents want to adopt the children, they will not be able to do so as long as the parental relationship with Mother persists. Thus, the continuation of that relationship greatly diminishes the children's chances of enjoying safety, stability and permanence. We accordingly affirm the trial court's findings as to the ground of persistence of conditions.

## VI. THE CHILDREN'S BEST INTEREST

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody,* 171

S.W.3d 187, 192 (Tenn. Ct. App. 1994).

It appears to us that the continuation of the parental relationship would be of very little benefit to Skylar and Waylon. It is unclear if Waylon, who came into DCS custody as an infant because of Mother's drug abuse, ever established any kind of relationship with Mother. Further, Mother lives far away and was unable or unwilling to come to Tennessee to appear at the termination hearing. She continues to struggle with the issues that brought the children into the custody of DCS in the first place, but without any evidence of progress. On the other side of the equation, the termination of Mother's parental rights will clear the way for an adoption by the couple with whom the children have been living and under whose care they are thriving.

The legislature has provided the courts with a list of non-exclusive factors to consider when determining the best interests of children in a parental termination case:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the

child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113

Most of the above factors support the trial court's conclusion that termination of Mother's parental rights would be in the best interests of Skylar and Waylon. These include, among others, Mother's failure to make adjustments that would make it safe for the children to be in her home and the unlikelihood of such adjustments in the foreseeable future (factors 1 and 2), the lack of regular visitation between Mother and the children (3), the effect a transfer of custody would likely have on the children (5), Mother's use of controlled substances (7) and Mother's failure to pay child support (9). In sum, we find that the trial court reached the correct conclusion as to the best interest of the children and we affirm the termination of Mother's parental rights.

## VII.

The order of the trial court is affirmed. We remand this case to the Juvenile Court of Sumner County for any further proceedings necessary. Tax the costs on appeal to the appellant, Evelyn L.

_____
PATRICIA J. COTTRELL, JUDGE

-12-